**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-5026

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL A. LOMAS,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  W. Earl Britt, Senior District Judge.  (5:07-cr-00117-BR-1)

Argued: March 26, 2010                    Decided: August 3, 2010

Before MICHAEL and DAVIS, Circuit Judges, and Eugene E. SILER, Jr., Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Elizabeth Brooks Scherer, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina, for Appellant.  Anne Margaret Hayes, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Stephen W. Petersen, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina, for Appellant.  George E. B. Holding, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Michael A. Lomas was indicted in a multi-count indictment charging conspiracy in violation of 18 U.S.C. § 371 and mail fraud in violation of 18 U.S.C. § 1341. Lomas pled guilty to one count of mail fraud pursuant to a plea agreement in which the parties left the issue of restitution for the sentencing court's determination. The district court sentenced Lomas to serve 240 months in prison and to pay $45,675,365.97 in restitution to 993 victims of his mail fraud scheme. On appeal, Lomas contends that under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, none of the 993 people in the restitution order qualify as "victims of the offense" to which he pled guilty and asks that we vacate the order of restitution. We reject Lomas's contention and, accordingly, we affirm.

I.

On May 10, 2007, Lomas was named in an 18-count indictment in the United States District Court for the Eastern District of North Carolina. Count One of the Indictment charged Lomas and his co-defendants with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341. Counts Two through Eighteen charged Lomas and his co-defendants, as principals and aiders and abettors, with individual substantive counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

3

The Indictment began with a lengthy introduction that described the operation and scope of the scheme to defraud and set out the roles played by Lomas and his six co-defendants. It clearly stated that the allegations set forth in the introduction were incorporated into each count of the Indictment. J.A. 56, ¶19 ("The allegations set forth in this Introduction are incorporated into each count in this Indictment.").

The introduction catalogued the extensive overlapping schemes that Lomas and his co-defendants used to defraud individuals out of approximately $70 million. In 1999, Lomas and co-defendant Michael Young operated an entity named The Agency Alliance Group (TAAG). TAAG operated a "lease program" in which individuals were promised a 15% annual return from revenue generated by pay telephones, payable monthly, in exchange for five annual investments of $6,000.

After Pennsylvania authorities issued TAAG a cease-and-desist order, Lomas and his co-defendants renamed their enterprise the "National Payphone Corporation" and reworked the terms of their scam, promising a 14.35% annual return and requiring a $7,000 annual investment. Otherwise, they continued to operate the same scheme. After a federal agency sued an unrelated entity that promised similar terms to investors, Lomas changed the name and appearance of his enterprise yet again.

4

In early 2001, Lomas and his co-defendants formed Mobile Billboards of America, Inc. This time they promised a 13.49% annual return, required seven annual investments of $20,000, and purported to generate revenue by selling ad space on the sides of trucks. Between 2001 and 2004, Lomas directed the promotion and sale of the "investments." The Indictment charged that Lomas made extensive use of false and misleading statements, both spoken and written, all of which were aimed at persuading his "investors" that he was operating a legitimate business that would generate sufficient money to make the promised investment returns and would carry little or no risk.

Lomas and his co-defendants scammed approximately $70 million through various iterations of this investment scheme. At the peak of his scheme in 2004, Lomas and his co-defendants took in approximately $4 million monthly. The government estimates that individuals lost tens of millions dollars to Lomas and his co-defendants.

On December 17, 2007, Lomas entered into a plea agreement with the government pursuant to which he agreed to plead guilty to Count Two of the Indictment. Count Two charged, in material part, that, on or about March 13, 2003, Lomas and his co-defendants "having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises," and "for

5

the purpose of executing such scheme and artifice," "placed in a post office and authorized depository for mail matter" a letter (sent by co-defendant Scott B. Hollenbeck) to retiree "GW" in Roanoke Rapids, North Carolina.  J.A. 59-60.

In exchange for Lomas's guilty plea to Count Two of the Indictment, the government agreed to dismiss the remaining counts of the Indictment, including the conspiracy charge.  Also as a part of his plea agreement, Lomas agreed to "make restitution to any victim in whatever amount the Court may order, pursuant to 18 U.S.C. 3663 and 3663A."  J.A. 64.  The district court accepted Lomas's guilty plea on January 7, 2008.  On August 18, 2008, the district court sentenced Lomas to the statutory maximum of 240 months.

The sentencing court also ordered Lomas to pay restitution.  In Lomas's Pre-Sentence Report, the Probation Officer reported that "[d]uring the course of the instant offense, 1,231 victims were defrauded and suffered a loss of $70,967,712.90."  J.A. 197, ¶18.  Nevertheless, the probation officer initially stated that restitution could not be ordered in this case.  The government objected, and filed a memorandum asking the district court to order Lomas to pay $45,675,365.97 in restitution to 993 victims.  On October 9, 2008, following a hearing, the district court ordered Lomas to pay $45,675,365.97 to 993 victims, stating that Lomas was jointly and severally liable with his

6

four co-defendants for this sum.  In support of its ruling, the district court cited the very broad definition of "offense" in 18 U.S.C. § 3663A(a)(2), and noted that Count Two of the Indictment, the count to which Lomas pled guilty, explicitly incorporated the description of the scheme from the Indictment's introductory section.

On October 14, 2008, Lomas filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

We review criminal restitution orders under an abuse of discretion standard.  United States v. Henoud, 81 F.3d 484, 487 (4th Cir. 1996); United States v. Hoyle, 33 F.3d 415, 420 (4th Cir. 1994). A sentencing court's discretion in ordering restitution "is circumscribed by the procedural and substantive protections" of the statute authorizing restitution. Henoud, 81 F.3d at 487.  Here, the applicable statute is 18 U.S.C. § 3663A, the Mandatory Victim Restitution Act of 1996 ("MVRA").[1]

---

[1] Restitution in federal court is governed by one of two statutes:  the Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, or the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A.  The structure and language of both the MVRA and the VWPA are substantially the same, other than in one respect:  the VWPA permits a district court to order restitution subject to a defendant's ability to pay and the MVRA
(Continued)

7

III.

The district court, after conducting a hearing, granted restitution in the amount of $45,675,365.97 to 993 victims. It clearly stated its reasoning on the record:

> The Court holds that the amount of restitution is not limited to the counts of conviction. The court bases its reasoning on 18 U.S.C. Section 3663(a)(2) [sic] for the purposes of restitution and victim and offense that involves as a scheme or pattern of criminal activity means any person directly in harm of the defendant's criminal conduct in the course of the scheme, conspiracy or pattern.
>
> Now, in the case of United States versus Henoud, 81 F.3d 484, the Fourth Circuit said this amendment is widely viewed as partially overruling Hughey's restrictive interpretation of the VWPA and expanding on the Courts' authority to grant restitution.
>
> Federal courts now allow broader restitution orders encompassing losses that resulted from a criminal scheme or conspiracy regardless of whether the defendant is convicted for each criminal act within that scheme. The harm must be a direct result of the defendant's criminal conduct though or closely related to the scheme.
>
> The scheme, in my view, and I so hold, is clearly described in the indictment in the introduction, which as I have pointed out earlier, is by paragraph 19 on page 7 incorporated into each count of the Indictment and the count to which the defendant pled guilty, Count 2, specifically refers to having devised a scheme and artifice to defraud.
>
> And United States versus Karam, 201 F.3d 320, the Fourth Circuit said that where one count specifically incorporated all of the factual allegations contained in another count, that the court could order or should order restitution based on that.

---

mandates restitution for certain crimes without consideration to the defendant's ability to pay. 18 U.S.C. §§ 3663 & 3663A. There is no dispute that this case is controlled by the MVRA.

8

> So this court holds that . . . by pleading guilty, the Defendant Lomas pled guilty and he admitted the conduct set forth in the introduction and incorporated into the count to which he plead guilty.

J.A. 117-18.

### A.

Lomas contends that none of the 993 people in the restitution order qualify as "victims of the offense" to which he pled guilty under the MVRA. See 18 U.S.C. § 3663A(A)(1) ("[T]he court shall order . . . that the defendant make restitution to the victims of the offense."). He argues, citing Hughey v. United States, 495 U.S. 411 (1990), superseded by statute, Crime Control Act of 1990, Pub. L. No. 101-647, § 2509, 104 Stat. 4863, as recognized in Henoud, 81 F.3d at 488, that under the MVRA, the term offense is limited to indicate "the offense of conviction," and that his "offense of conviction" was a very narrow mail fraud offense with a single victim. Thus, Lomas argues that he should only be required to pay restitution, if any, to "retiree G.W.," the only victim who could have been directly harmed by the specific, narrow scheme that Lomas insists he pled guilty to when he pled guilty to Count Two of the Indictment.[2]

---

[2] Lomas relies on United States v. Adams, 363 F.3d 363 (5th Cir. 2004), but that case is easily distinguished. In Adams, the Fifth Circuit held that the parties to a plea agreement may, if they choose, narrow the scope of the scheme alleged in an
(Continued)

9

The government argues that Lomas was correctly ordered to pay $45,675,365.97 in restitution to 993 people because the Indictment plainly manifested that he defrauded all of those victims. It argues that the allegations regarding Lomas's five-year scheme are detailed in the introduction of the Indictment and are all explicitly incorporated into each count of the Indictment, including Count Two. The government adds that nothing in Lomas's plea agreement or guilty plea colloquy narrowed the factual basis of his conviction. Thus, the government continues, Lomas's conviction was sufficiently broad to support the district court's restitution order.

B.

The government clearly has the better of the argument here. The 1990 amendments to the VWPA, as interpreted by Henoud, 81 F.3d at 488, fatally undermine Lomas's argument that the law

---

indictment for restitution purposes. Adams, 363 F.3d at 366-68. The court found on the facts in that case that the defendant and the government (essentially by acquiescence to the defendant's insistence) narrowed the scope of the scheme in their plea agreement from the broader scheme alleged in the indictment. Id. at 367. Here, the parties did not narrow the scope of the scheme alleged in the indictment in the plea agreement. To the contrary, as part of the negotiated plea agreement in this case, the parties agreed that Lomas would "make restitution to any victim in whatever amount the Court may order, pursuant to 18 U.S.C. 3663 and 3663A." J.A. 64. Thus, the parties expressly left for the determination by the sentencing court the contours of a restitution order.

only required him to pay restitution to victims explicitly named in the count of his Indictment to which he pled guilty. Although Henoud interpreted the 1990 amendment as it applied to the VWPA, a later amendment added identical language to the MVRA. Compare Crime Control Act of 1990, Pub. L. No. 101-647, § 2509, 104 Stat. 4863 (codified as amended at 18 U.S.C. § 3663(a)(2)(1994)) with Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 204(a), 110 Stat. 1227 (codified at 18 U.S.C. § 3663A(a)(2)(2000)). Accordingly, our interpretation of the language in U.S.C. § 3663(a)(2) from Henoud controls this case and we hereby adopt it.

In Henoud, 81 F.3d at 488, we explained that the 1990 amendment to 18 U.S.C. § 3663(a)(2) broadened the ability of district courts to grant restitution. We stated:

> The amendment is widely viewed as partially overruling Hughey's restrictive interpretation of the VWPA and expanding district courts' authority to grant restitution. See United States v. Kones, 77 F.3d 66, 69 (3rd Cir. 1996); United States v. Broughton-Jones, 71 F.3d 1143, 1147 n.1 (4th Cir. 1995). The majority view is that the 1990 amendment "did have a substantive impact on the amount of restitution a court could order when a defendant is convicted of an offense involving a scheme, conspiracy, or pattern." United States v. DeSalvo, 41 F.3d 505, 515 (9th Cir. 1994). Federal courts therefore now allow broader restitution orders encompassing losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme. See, e.g., United States v. Manzer, 69 F.3d 222, 230 (8th Cir. 1995). The harm must be a direct result of the defendant's criminal

11

conduct, though, or "closely related to the scheme." <u>Kones</u>, 77 F.3d at 70.

<u>Id.</u> (holding that the trial court did not err when it ordered restitution for losses caused by acts for which the defendant was not convicted).

Applying that analysis to the same language in the MVRA, 18 U.S.C. § 3663A(a)(2), it is clear that the district court here properly ordered Lomas to pay restitution as it did. The MVRA states, in pertinent part:

> (a)(1) Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense . . .
> (2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. . . .
> (3) The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.
> . . . .
> (c)(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—
> (A) that is--
> (i) a crime of violence, as defined in section 16;
> (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit; . . . .

18 U.S.C. § 3663A.

12

The MVRA requires the court to order a defendant to pay restitution to victims of certain crimes. § 3663A(a)(1) ("the court shall order"). Because mail fraud is a crime against property under Title 18 of the United States Code, it triggers the MVRA and thus the district court was required to order restitution to the victims of Lomas's crime.

The statute also clearly defines "victims." Victims are those who are "directly and proximately harmed as a result of the commission of an offense." § 3663A(a)(2). When the crime involves a scheme or pattern of criminal activity, the universe of victims includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." Id. Lomas's conviction was based on his knowing participation in a scheme to defraud executed through the use of the mails in violation of 18 U.S.C. § 1341. Since mail fraud necessarily includes a scheme to defraud, and in fact includes it as an element of the crime itself, United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006), the victims affected by Lomas's offense include all persons harmed by Lomas "in the course of [his participation in] the scheme." See § 3663A(a)(2).

Lomas disputes the scope of the scheme. We reject his contention that the plea agreement narrowed the scope of the charged scheme, and we can discern no other basis on which to

13

adopt Lomas's contentions.    We most recently discussed this issue in <u>United States v. Karam</u>, 201 F.3d 320, 325-26 (4th Cir. 2000).[3]    There, Thomas E. Karam, a certified public accountant, was indicted for wire fraud, money laundering, and aiding and abetting.    <u>Id.</u> at 323.    The indictment charged him with executing a multi-year scheme to defraud private medical entities such as Fairfax Anesthesiology Associates, Inc., out of millions of dollars.    <u>Id.</u> at 325.    Karam pled guilty to a single count of wire fraud in which he was charged with executing the scheme by requesting an electronic funds transfer of $150,000. That count of the indictment specifically incorporated all of the factual allegations contained in the indictment, allegations that detailed Karam's long-term scheme to defraud private medical practices.    <u>Id.</u>    The district court sentenced Karam to 24 months imprisonment and ordered him to pay $774,508 in restitution, an amount covering losses beyond the losses arising from the count of conviction.    <u>Id.</u> at 323-24.    On appeal, Karam challenged the amount of the restitution order, arguing that he was required to pay only $150,000, the amount explicitly stated

---

[3] Again, <u>Karam</u> addresses the application of 18 U.S.C. § 3663(a)(2), rather than 18 U.S.C. § 3663A(a)(2).    As discussed above, both restitution statutes contain the same definition of "victim," including the definition that applies when the offense of conviction has a scheme as an element of the offense.    <u>See</u> 18 U.S.C. §§ 3663(a)(2) & 3663A(a)(2).

in the count of conviction.  Id. at 325.  He argued that the additional $624,508 in restitution was not directly related to the conduct underlying his conviction.

We rejected Karam's contentions and affirmed, holding that, "[f]ederal courts may order restitution encompassing losses resulting from a criminal scheme 'regardless of whether the defendant is convicted for each criminal act within the scheme,' so long as the loss is a direct result of the defendant's criminal conduct or is 'closely related to the scheme.'" Id. at 325-26 (citing Henoud, 81 F.3d at 488).  We evaluated the $624,508 in restitution that was ordered in addition to the $150,000 and found that the additional money was "directly related to the conduct underlying Karam's conviction" because it represented losses that resulted from the same scheme to steal money from medical professionals by purporting to invest their money in fraudulent investment schemes.  Id. at 326. Specifically, in addition to stealing money (by failing to meet payroll tax liabilities) from medical groups, Karam also stole from individual physicians by inviting them to "defer" their bonuses and purporting to "invest" their money in a business that promised a 15% return.

Thus, under Karam, a sentencing court may order restitution for losses resulting from a scheme even if the defendant is not convicted of each individual criminal act, e.g., indictment

15

count, as long as the acts are the direct result of the defendant's criminal conduct or are "closely related to the scheme."[4]  Id.; see also Henoud, 81 F.3d at 488.  Here, both condition precedents are fulfilled.  The financial harm inflicted on Lomas's victims was the direct result of Lomas's knowing participation in the overall scheme to defraud individuals by inducing them to invest in fraudulent business enterprises.  And Lomas's knowing participation in the charged scheme to defraud satisfies the "closely related" standard.  The district court required Lomas to pay restitution to individuals whom he defrauded via mail fraud in the same manner as he attempted to defraud the individual identified in Count Two ("retiree GW").  In fact, Lomas's schemes are more tightly connected than the schemes carried out in Karam because Lomas actually used the various derivations of the same scheme to

---

[4]  Our sister circuits agree that when the crime of conviction includes a scheme as an element of the offense, restitution may be ordered based on acts for which the defendants was not convicted.  E.g., United States v. Brock-Davis, 504 F.3d 991, 999 (9th Cir. 2007) ("when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, . . . the restitution order[may] include acts of related conduct for which the defendant was not convicted"); United States v. Holthaus, 486 F.3d 451, 458 n.6 (8th Cir. 2007) (explaining that MVRA superseded Hughey's holding and that it authorizes restitution for every victim harmed in the course of the defendant's scheme, not just the offense of the conviction); United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996) (same).

defraud his victims, whereas in <u>Karam</u>, the defendant employed two related but separate schemes. Either way, the restitution ordered in this case falls safely within the boundaries staked out in <u>Karam</u> and <u>Henoud</u>.

Thus, the district court fully acted within its discretion when it awarded $45,675,365.97 in restitution to Lomas' 993 victims.

IV.

For all of these reasons, the district court decision is

<u>AFFIRMED</u>.